# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| SUSAN FOLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:09-cv-239-GZS |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court held a bench trial in this matter on June 28, 2010.  The bench trial transcript was filed on July 19, 2010.  (Tr. (Docket # 59).)  The parties each filed Proposed Findings of Fact and Conclusions of Law on August 6, 2010.  (Docket #s 62 & 64.)  Neither party filed supplemental memoranda.  (See Stip. Re Post-Trial Briefing (Docket # 66).)  In accordance with Federal Rule of Civil Procedure 52(a), and having reviewed the parties' post-trial submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1. On the morning of March 8, 2007, Plaintiff Susan Foley was scheduled to fly from Orlando, Florida to Ronald Reagan Washington National Airport ("DCA"), located in Arlington, Virginia, where she would transfer to a second flight traveling to the Portland International Jetport ("PWM") in Portland, Maine.  As will be detailed below, during this transfer at DCA Foley slipped and fell while going through the security line (hereinafter referred to as "the Incident").

**A. The Parties**

2. Plaintiff Susan Foley resides in Thomaston, Maine. She is approximately five feet, three inches tall. At the time of the Incident, Foley was 63 years old.

3. Since the late 1990s, Foley has worked as a caregiver to the elderly to provide financial support to herself and her adult daughter who is disabled. She has earned a GED and has taken four years' worth of college courses.

4. Foley had travelled by plane about ten times prior to the Incident, including three trips since September 11, 2001 and one trip to Arizona on Southwest Airlines where she went through security and changed planes without experiencing any problems.

5. In this case, the United States of America serves as the named Defendant representing the Transportation Security Administration ("TSA"), an agency within the United States Department of Homeland Security. TSA is responsible for protecting the nation's transportation systems from security threats. (See Answer (Docket # 6) at 1 n.1 & ¶4.)

6. At the time of the Incident, TSA provided Transportation Security Officers who conducted security screening at DCA.

**B. DCA**

7. The Metropolitan Washington Airport Authority ("MWAA") is responsible for the operation of DCA and its tenants, the airlines and vendors.

8. The Incident occurred at the DCA north pier checkpoint, Terminal C (the "Checkpoint").

9. The floor at the Checkpoint is made of dark granite tile. The TSA standard issue bins in use at the time of the Incident were light gray.

10. There is both natural lighting and florescent tube lights at the Checkpoint.

11. At the Checkpoint, bins for passengers' belongings are stacked before a "divestment table" located directly in front of the x-ray machine. Along the leading short edge of the table, there is a glass "slider" separating the stack of bins and the table which does not extend significantly past the edge of the table. (See Tr. at 24, 151-52.)

12. There is one passenger "lane" associated with each x-ray machine. (Tr. at 150.) After placing their belongings on the x-ray machine, passengers proceed from a public area through a magnetometer to the secure or "sterile" side. (See Tr. at 156.)

13. Mitchell Viruet, currently a TSA inspector, was hired by the TSA in 2003 and has had assignments with increasing levels of responsibility. At the time of the Incident, Viruet was on duty as the Supervisory Transportation Security Officer ("Supervisor") at the Checkpoint and had responsibility for safety at the Checkpoint.

14. As Supervisor, Viruet was trained to be on the lookout for hazards and to ensure that his staff similarly looked out for hazards.

15. The TSA "rule of thumb" in March 2007 was to keep bins stacked no more waist high. At the time of the incident, if Viruet saw a stack of bins about five feet high he would have asked an officer to break the stack of bins in half. (See Tr. at 154-55.)

16. As bins get utilized at the Checkpoint, there typically are two to three loose bins, separate from the stack, sitting on the floor in front of the slider.

17. The Checkpoint is under video surveillance. The video surveillance system is owned and operated by MWAA.

## C. The Incident at DCA

18. On March 8, 2007, Foley wrapped up a weeklong visit with her brother during which she walked, swam and kayaked. She departed Leesburg, Florida around 4:30 am and drove to the airport in Orlando, arriving about an hour later at approximately 5:30 am.

19. At the Orlando airport, Foley went through the security line—placing her personal belongings in a standard TSA gray bin and walking through the magnetometer—without experiencing any problems.

20. Foley's first flight left Orlando at approximately 6:30 am and arrived at DCA at approximately 9:00 or 9:30 am. Foley does not recall exactly how much time she had at DCA before her connecting flight to PWM.

21. When Foley arrived at DCA, she and the other passengers on her flight were instructed to go through security again prior to catching their next flight. As instructed, Foley proceeded to the security line at the Checkpoint. Foley carried a purse and wheeled a carry-on bag.

22. At the time, there were two security lanes open at the Checkpoint. There were about fifteen to seventeen TSA agents working in the area.

23. Immediately prior to the Incident, TSA Supervisor Viruet was on the sterile side of the Checkpoint and was watching his officers to make sure they were doing their jobs.

24. Foley perceived the security line to be crowded, with passengers hurrying to get through security. From Viruet's perspective, however, it was not a particularly busy morning at the Checkpoint.

25. There was a stack of bins on the floor on Foley's left side as she approached security. There were not enough bins in one of the security lanes and, as a result, passengers crossed over to Foley's lane to pick up bins.

26. Just prior to the Incident, Viruet noticed that more bins were needed out front. Viruet made a request for his supervisees to bring out more bins to be placed in front, and Officer Chad Young—who no longer works for TSA—gathered up some bins and started pushing the stack toward the front of the lane.

27. At the same time, Viruet, still positioned on the sterile side of the Checkpoint, noticed a single bin on the floor of lane two; the fallen bin was on the far side of the panel, with approximately three-quarters of its length jutting out towards the pathway of the passengers.

28. Viruet did not perceive this bin to present a hazard as it did not appear to be in the passenger walkway and was easily perceived by the naked eye. As a result, Viruet did not go to move the bin nor did he instruct anyone to pick up the bin.

29. Foley's focus was looking ahead and anticipating what she had to do to get through security; she was not focused on the stack of bins or the pathway in front of her.

30. As she approached the divestment table, she was anticipating getting a bin and placing her shoes in the bin. Foley took her shoes off as directed and held them in her hands.

31. As Foley proceeded toward the magnetometer in lane two, she fell with her full weight landing on her right hip and right shoulder.

32. Viruet did not directly observe Foley's fall. He did not interview her about what happened to her or where she fell.

33. Officer Young informed Viruet of the Incident. Less than five minutes had passed from the time Viruet had seen the lone bin on the floor until he was notified of the slip and fall.

34. Viruet approached the public area but noticed that a couple of managers were already looking after Foley; he therefore proceeded back to the Checkpoint to make sure that his officers continued to perform their duties.

35. Foley could not get up or bear weight on her right ankle or right hip after the Incident.

36. At 9:35 am, an ambulance was dispatched. At 9:44 am, the ambulance attendant arrived in the vicinity of Foley, who was found sitting in a chair. At 10:10 am, the ambulance left the scene, arriving at the Virginia Hospital Center (the "hospital") at 10:24 am.

37. Foley was seen in the hospital's emergency room at 11:15 am. Approximately twenty-five minutes later, Foley reported at the hospital that she had no prior history of injury to her ankle; she denied hitting her head; and she "denie[d any] other injury." (Pl. Trial Ex. 2 at 00018.).

38. Foley was diagnosed with medial malleolus fracture and was treated with a posterior splint on her right ankle. She was instructed to follow up with an orthopedic doctor when she returned to Maine.

39. Foley was able to return to her home in Thomaston, Maine that same day. She arrived at approximately 11:30 pm after flying from DCA to PWM and taking a limousine car ride home.

40. Foley has no clear recollection of what caused her to fall or the circumstances of her accident including how the bin ended up in front of her. She has provided inconsistent versions of what caused her to fall.

41. Plaintiff filed her administrative FTCA claim on September 4, 2008, in which she asserted that falling bins caused her to trip and fall. (See Def. Trial Ex. 101; Tr. at 52.)

**D. Foley's Recovery and Subsequent Medical Care in 2007**

42. During the first month after the accident, Foley found it difficult to move around, see friends, work, or go down the stairs to leave her second-floor apartment. She had pain in her right hip and ankle, and had trouble sleeping because of this pain.

43. Foley could not drive for four weeks after her fall. As a result of not being able to drive, Foley missed work for three weeks, for a total of $300 in lost wages. After that, a friend drove her to work.

44. On March 12, 2007, Foley was treated for injuries stemming from the Incident for the first time in Maine at Penobscot Bay Orthopaedic Hand and Sports Medicine ("Pen-Bay"). At the time, Foley was using a walker and nonweightbearing on her right ankle. She was diagnosed with an undisplaced fracture of the medial malleolus (the inside bone of the ankle). She was placed in a short leg cast and cast boot.

45. Foley was next treated at Pen-Bay on March 26, 2007, when she reported "no reinjury" and had "no complaints other than loosening of the cast." (Pl. Trial Ex. 2 at 00038.)

46. Foley was treated at Pen-Bay for a third and final time on April 9, 2007, when her medical provider determined that she should discontinue use of the cast and instead use a walking brace. At the time, Foley had slight tenderness over the medial malleolus, but none elsewhere; her ankle mortise was well preserved; she could bear weight and was comfortable. She reported that her ankle was "feeling better." (Id. at 00039.)

47. Foley was scheduled for a follow-up appointment at Pen-Bay for two-weeks later on April 23rd. On April 20, however, Foley called to cancel the appointment, reporting that

her ankle was feeling better and that she would call if she needed to reschedule. Foley did not seek further orthopedic treatment from Pen-Bay.

48. On May 31, 2007, Foley was treated at Midcoast by Dr. Linville, who performed strength testing and concluded that it was normal, with no indication of any abnormality in the arms. (Tr. at 130-31.) Dr. Ashmore testified that if there had been a rotator cuff injury at the time, she would have expected Dr. Linville to have noticed and noted such a limitation in the record. (See id.)

49. Dr. Ashmore took over Foley's care after Dr. Linville moved out of town. Dr. Ashmore treated Foley for the first time after the Incident on September 20, 2007. During this visit, Foley requested that Dr. Ashmore continue to provide the same treatment as Dr. Linville because it was helping with her pain. There is nothing in the treatment note for this appointment regarding Foley's range of motion for the upper or lower extremities.

50. At the recommendation of Pen Bay, Foley received physical therapy for her ankle from June through December 2007, which was overseen by her primary care doctor.

51. In September or October of 2007, Foley began working 64 hours per week as a caregiver for Ann Symington, a 91-year-old woman who does not need physical assistance.

**E. Foley's Back & Shoulder**

52. In addition to the obvious injury to her right ankle, Foley claims that the Incident also caused injury to her right shoulder and back.

53. In her work as a caregiver, Foley sustained a number of work-related injuries to her back prior to the Incident. In October and December of 2001, Foley sprained her back, for which she received medical treatment until January of 2004. She lost no time from work due to the injury. In September of 2004, Foley again injured her back, for which she was

treated with two months of physical therapy ending in October of 2004. Foley had no further medical treatment for her back from October 2004 through March 8, 2007.

54. Foley's medical records do not indicate any treatment for any possible injury to her right shoulder or right ankle in the decade prior to March 8, 2007. Foley's last medical examination prior to the Incident was on July 26, 2006 and was for a health concern unrelated to her ankle, back or shoulder.

55. Dr. Ashmore testified that Foley's pre-existing medical conditions "could have been aggravated" by the Incident. (Tr. at 133-34.) On January 10, 2008, Dr. Ashmore noted in a letter that since the Incident Foley "had an exacerbation of her chronic low back pain and shoulder pain." (Pl. Trial Ex. 2 at 00123; Def. Ex. 111.) Dr. Ashmore was not aware at the time of any rotator cuff injury and accordingly did not mention it in this letter. (Tr. at 134.)

56. There is no anatomical evidence in the medical records, including the x-ray and MRI reports, to suggest the Incident caused Foley's ongoing shoulder and back pain.

57. Since the Incident, Foley also has self-injured her back, by bending over to pick up a box and trying to move her bed, which also have inflamed her chronic back injury.

58. Since the Incident, Foley has on occasion continued with activities such as traveling even though she claims that travel bothers her back. She has, for example, travelled eight to ten times to a friends' camp which is approximately five hours from Foley's home and at which she sometimes goes canoeing. In February 2008, Foley traveled to Tortola for a two-week trip that was a combination of work and pleasure; during this trip, Foley spent most of her time on a boat sailing the islands. In approximately March of 2008, Foley and a friend traveled by car from Maine to Florida; the drive down took about three days;

Foley stayed in Florida for a week and then returned to Maine in another three-day car trip.

59. On October 2, 2009, Foley was in a motor vehicle accident during which she was hit on the driver's side by a pickup truck. Foley suffered a whiplash injury as well as injury to her right shoulder. On October 8, 2009, a MRI indicated the possible presence of a rotator cuff tear.

## F.  The Lack of Any DCA Video of the Incident

60. A significant issue at trial in this matter was the inability of Defendant to produce any video of the incident despite the fact that the security video recorded the Incident and was even viewed by at least one TSA employee. The Court makes the following factual findings related to the missing video:

61. Daryush Mazhari, a TSA employee and Customer Support Quality Improvement Manager ("Manager"),[1] is generally notified via text or email—sometimes even when he is off duty—of approximately two to four, and sometimes as many as ten, incidents every day at DCA. Such incidents would include events requiring a call to law enforcement or involving a medical need.

62. Mazhari has reviewed more than 200 airport surveillance videotapes since joining the TSA in 2005.

63. TSA began reviewing airport surveillance video in response to a sense that the government, without sufficient investigation, was paying out money unnecessarily to

---

[1]  Mazhari is responsible for customer support, travel protocols for VIPs and the "wounded warrior" program at DCA. (Tr. at 176-78.) He has a BA degree and certifications in managing mass fatalities and emergency response, and previously worked for U.S. Airways for twenty-two years, including ten years as general manager.

settle meritless or even fraudulent legal claims—such as damage to a laptop computer dropped by a passenger.

64. Mazhari generally developed the approach to reviewing airport surveillance video. One purpose of reviewing surveillance video is to get a sense of whether the government is potentially negligent or otherwise at fault, or if it appeared to be just an accident. TSA uses the videos, in part, to filter out claims, and in this capacity, Mazhari evaluates what evidence should be preserved to protect the government from being presented with fraudulent claims.

65. Generally, to obtain a copy of a surveillance video, Mazhari must request it through TSA's law enforcement representative, who will make the request to MWAA through its legal counsel.

66. Unless a specific request is made to preserve a video, MWAA's system erases videos automatically after thirty days. It is a tedious process to save surveillance video, and requests for preservation are made only in limited circumstances. For example, TSA requested to save the video that captured an incident involving a passenger who alleged that her fall was caused by a checkpoint officer who deliberately pulled a chair away from her. Similarly, TSA requested that the video be saved where a passenger alleged that TSA spilled out a child's juice but the video showed that it was the passenger who actually spilled it.

67. Mazhari does not make the final decision as to whether a particular surveillance video is preserved. Rather, he reports what he sees to the TSA Claims Division.

68. Mazhari attends staff meetings twice per week to discuss a variety of matters, including incidents that have transpired and surveillance videos. The Federal Security Director

("FSD")—the highest ranking TSA official at the airport—attends these twice-per-week staff meetings with her immediate staff. Not every incident at the airport is necessarily discussed at these staff meetings, but most significant events are.

69. Based in part on information discussed at these meetings, the FSD, with counsel's advice, ultimately makes the decision as to whether to request preservation of a particular MWAA video. The magnitude of the event often dictates whether or not the FSD will decide to save the video, but there are other factors applied by the FSD and legal counsel.

70. The March 8, 2007 Incident was captured on videotape by the airport video surveillance system.

71. On the same day of the Incident, Mazhari reviewed the videotape immediately after being informed about it.

72. Mazhari does not recall in significant detail what he viewed on the videotape of the Incident.

73. Mazhari testified that he recalled the video showing Foley divesting at the table and getting ready for her personal belongings to go through security; she then stepped back away from the magnetometer, in what appeared to be bare feet, and accidentally put her foot into a lone bin that was lying on the floor; she then slipped and fell on her right side.[2]

74. Mazhari did not write a report detailing what he viewed on the videotape of the Incident.

75. Mazhari raised the Incident at the next staff meeting. Mazhari described for the group, including FSD Karen Burke, what he saw on the video. Mazhari recalls that the managers asked him whether there were any paramedics on the scene, but little else was

[2] Although this testimony is credible on its face, as will be discussed below, *infra* footnote 3, the testimony is subject to an adverse inference. While the Court recites this testimony for the purpose of clarifying the record, the Court gives it no weight in its analysis.

discussed.  There was no discussion of potential litigation.  There was no discussion regarding any decision to preserve or not preserve the video.

76. Ultimately, no affirmative decision was made to preserve the video and it was erased in accordance with MWAA's standard procedures.

77. Foley did not learn that a video of the Incident existed until after her lawyer filed an administrative claim and this lawsuit.

## II.    CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to the Federal Tort Claims Act.  <u>See</u> 28 U.S.C.A. § 1346(b)(1).

2. The Court has applied an adverse inference to the testimony of Mr. Mazhari regarding the missing videotape evidence.[3]

3. Plaintiff has failed to establish by a preponderance of the evidence that Defendant breached a duty of reasonable care and was therefore negligent under the law.

---

[3]At trial, the Court allowed Mazhari to testify about what he viewed in the surveillance video of the Incident but ruled that an adverse inference would be applied as a fact finder due to Defendant's failure to preserve the evidence. (<u>See</u> Tr. at 207.)

Virginia's "spoliation of evidence" rule allows the drawing of an adverse inference against a party who intentionally destroys or fails to preserve or produce evidence.  <u>Haliburton v. Food Lion, LLC</u>, No. 3:07cv622, 2008 WL 1809127, at *4 (E.D. Va. April 21, 2008) (quoting <u>Hodge v. Wal-Mart Stores, Inc.</u>, 360 F.3d 446, 450 (4th Cir. 2004)).  This inference, however, "cannot be drawn merely from [the] negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction."  <u>Hodge</u>, 360 F.3d at 450 (citation omitted).  The party seeking the adverse inference must show that "the adverse party had a duty to preserve the allegedly spoiled [evidence] and that the [evidence was] intentionally destroyed."  <u>Haliburton</u>, 2008 WL 1809127, at *4 (citation omitted).  Mazhari's testimony revealed that he did not specifically request for the videotape to be preserved and as a result it was destroyed.  He also testified that the TSA had preserved videotapes in cases where the TSA was, in fact, not negligent.  Based on Mazhari's testimony regarding the decision-making process surrounding not preserving the videotape evidence, the Court determined that an adverse inference was warranted.

Accordingly, in making the following conclusions of law, the Court has given no consideration to any portion of Mazhari's testimony concerning what he viewed in the surveillance tape of the Incident.

4. Alternatively, even if Defendant was negligent, Defendant has established by the greater weight of the evidence that Plaintiff's contributory negligence in failing to avoid an open and obvious danger was a proximate cause of the accident.

5. Plaintiff's own negligence is a complete bar to recovery.

6. Accordingly, Plaintiff is not entitled to recover any damages, including but not limited to pain and suffering, loss of enjoyment of life, medical bills, lost income, and potential loss of earnings. Nor is Plaintiff entitled to an award of attorneys' fees and costs.

## III. DISCUSSION

### A. Legal Standard

Plaintiff brings this action to recover for personal injuries she sustained when she slipped and fell at a security checkpoint at DCA on March 8, 2007.[4] Specifically, she asserts a common-law negligence claim against Defendant and relies on the doctrine of negligence *per se*. Because the slip and fall accident occurred in Virginia, Virginia substantive law applies to this Court's consideration of whether or not Defendant negligently caused harm to Plaintiff. See 28 U.S.C.A. §§ 1346(b), 2674 (Federal Tort Claims Act incorporates the applicable substantive tort law of the accident site).

To prove a *prima facie* negligence case under Virginia law, "a plaintiff bears the burden of proving 'the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage.'" Williams v. Food Lion, LLC, No. 3:09cv108, 2009 WL 3366923, at *2 (E.D. Va. Oct. 16, 2009) (quoting Atrium Unit Owners Ass'n v. King, 585 S.E.2d 545, 548 (Va. 2003) (additional citation omitted)). "A business owes its customers a duty to exercise ordinary care

---

[4] Plaintiff claims $175,000 in total damages, including special damages for accident-related medical bills of about $24,000; compensatory damages for $300 in lost wages, future medical expenses, pain and suffering, and loss of enjoyment of life; and costs. (See Compl. (Docket #1) ¶12; Pl.'s Proposed Findings & Conclusions (Docket # 62) at 20-23.)

for those customers when they are on the business' premises." Kitts v. Boddie-Noell Enters., Inc., No. 3:09-CV-00060, 2010 WL 2218053, at *2 (W.D. Va. June 1, 2010) (citing Winn-Dixie Stores, Inc. v. Parker, 396 S.E.2d 649, 650 (Va. 1990)).  "An owner has an obligation to remedy or warn of defects on its premises of which it has knowledge or should have knowledge, except for those defects that are open and obvious to a reasonable person exercising ordinary care for her own safety." Kitts, 2010 WL 2218053, at *2 (citing Knight v. Moore, 18 S.E.2d 266, 269 (1942) (additional citations omitted)). See also Williams, 2009 WL 3366923, at *2 (noting that "[t]he Supreme Court of Virginia has articulated well-settled rules applicable to slip-and-fall cases").

In addition to the common law duty, Virginia recognizes the doctrine of negligence *per se*. McGuire v. Hodges, 639 S.E.2d 284, 288 (Va. 2007).  "The doctrine of negligence *per se* represents the adoption of the requirements of a legislative enactment as the standard of conduct of a reasonable person." Id. (citation and internal punctuation omitted)  A plaintiff who relies on negligence *per se* does not need to establish common law negligence, provided she produces evidence that:  (1) defendant violated a statute or ordinance enacted for public safety; (2) plaintiff belongs to the class of persons for whose benefit the safety rule or statute was enacted and the harm suffered was of the type the statute or ordinance was designed to protect against; and (3) that the statutory violation was a proximate cause of the injury.  Id.

Under Virginia law, contributory negligence operates as a complete bar to recovery for a defendant's alleged negligence.  See, e.g.,; Adams v. Bussell, No. 5:08-CV-00105, 2009 WL 2151329, at *3 (W.D. Va. July 16, 2009); Litchford v. Hancock, 352 S.E.2d 335, 337 (Va. 1987) ("Negligence of the parties may not be compared, and any negligence of a plaintiff which is a proximate cause of the accident will bar a recovery.")).  Defendant has the burden of proving

contributory negligence "by the greater weight of the evidence." Rascher v. Friend, 689 S.E.2d 661, 664 (Va. 2010).

Assessment of contributory negligence is an objective standard: a plaintiff's negligence claim is barred by her contributory negligence if she "failed to act as a reasonable person would have acted for [her] own safety under the circumstances." Adams, 2009 WL 2151329, at *3 (quoting Artrip v. E.E. Berry Equip. Co., 397 S.E.2d 821, 824 (Va. 1990)). In short, "[t]he essential concept of contributory negligence is carelessness." Rascher, 689 S.E.2d at 664 (quoting Jenkins v. Pyles, 611 S.E.2d 404, 407 (2005)). "A person who trips and falls over an open and obvious condition or defect is guilty of contributory negligence as a matter of law." Scott v. Lynchburg, 399 S.E.2d 809, 810 (Va. 1991); see also Kitts, 2010 WL 2218053, at *2 ("A plaintiff is guilty of contributory negligence as a matter of law when he or she trips over a hazard that he or she should have seen, even if he or she did not actually see it.") (citation omitted).

**B.  Negligence *per se***

The TSA has developed and implemented a Standard Operating Procedure Manual for its employees. As a compromise on a discovery issue, Defendants produced, in lieu of this Manual which it considered to be confidential, a Declaration from TSA Transportation Security Specialist Ronald Mildiner. (See Def.'s Mot. *in Limine* to Preclude the Assertion of Negligence *Per Se* & Exclude the Mildiner Declaration (Docket # 37) at 2.) In this Declaration, Mildiner explained the general safety requirements that TSA has developed internally, which applies only to TSA employees and not to the general public. (Id.) The Declaration was admitted into evidence at trial over the objection of Defendant. (See Tr. at 142; Pl. Trial Ex. 5 (Mildiner Affidavit).)

Plaintiff asserts the doctrine of negligence *per se*, alleging that Defendant is liable because the TSA employees did not follow their own safety standards as detailed in this Manual. The Court disagrees. As explained by the Supreme Court of Virginia, the doctrine of negligence *per se* only applies when a defendant "violated a statute enacted for public safety, that the proponent belongs to the class of persons for whose benefit the statute was enacted and the harm suffered was of the type against which the statute was designed to protect, and that the statutory violation was a proximate cause of the injury." McGuire, 639 S.E.2d at 288 (citations omitted). Here, the TSA's internal safety requirements do not constitute a legislative enactment, statute or ordinance enacted for public safety, the violation of which would be necessary to establish negligence *per se*. See, e.g., Talley v. Danek Med., Inc., 179 F.3d 154, 158-59 (4th Cir. 1999) (negligence *per se* may only be based on the alleged violation of a legislative enactment that codifies a particular standard of care to be followed). Rather, the Court finds that they are internal, confidential, private rules that were intended only to apply to TSA employees.[5]

## C. Common law negligence

The Court therefore turns to the questions of whether Defendant negligently maintained the Checkpoint, and whether as a result of that negligence, Plaintiff tripped and fell, sustaining painful and permanent injuries including a right ankle fracture and back and shoulder injuries.

---

[5] While the Court did admit the Mildiner Declaration as relevant evidence, it did not do so for the purpose of establishing the common law standard of care. Notably, private party rules, like the TSA safety requirements here, are inadmissible for this purpose. See McDonald v. Wal-Mart Stores East, LP, No. 3:07cv425, 2008 WL 153782, at *5-6 (E.D. Va. Jan. 14, 2008) (holding that internal employee store policies regarding unpacking and shelving products could not be used to establish the common law standard of care applicable to a customer who slipped and fell); Pullen v. Nickens, 310 S.E.2d 452, 456-57 (Va. 1983) (in personal injury case brought by injured motorist against highway workers, concluding that it was reversible error for internal highway employee guidelines to be admitted to establish standard of care where no motorists knew about or relied upon the internal guidelines).

In any event, and as the Court stated when admitting the Mildiner Declaration into evidence, the rules summarized in the document—*e.g.*, to make sure things are dry, to wipe up spills, to prevent a tripping hazard, and to keep the passageways clear of obstructions—are essentially "common sense." (Tr. at 142-43.) (accepting Plaintiff's Trial Exhibit 5 into evidence over objection).

There seems to be no disagreement as to whether Defendant owes a duty to the public, including Plaintiff, to provide reasonably safe security screening checkpoints at DCA. But all agreement ends there, and the parties tell entirely conflicting accounts of the events immediately leading up to Plaintiff's accident. According to Plaintiff's theory of the case, Defendant breached its duty of reasonable care by allowing a stack of bins to remain precariously high; as a result of this breach of duty, a number of bins from the stack toppled over immediately in front of Plaintiff as she walked in the screening area, unavoidably causing her to trip and fall. (See Compl. ¶11; Pl.'s Proposed Findings & Conclusions at 15-16.) Defendant's theory of the case is that no bins toppled suddenly in front of Plaintiff;[6] rather, Defendant asserts that Plaintiff accidentally stepped into a bin resting in her pathway, which was both open and obvious, and fell. (See Def.'s Answer (Docket # 6) at 4; Def.'s Proposed Findings & Conclusions (Docket # 64) at 30.)

After sitting through an entire day's worth of testimony from witnesses on both sides, the Court still does not have a clear sense of what precisely transpired on March 8, 2007. In Plaintiff's case-in-chief, the only occurrence witness was Plaintiff herself. However, Plaintiff's own memory of the Incident is so limited that the Court is hard pressed to credit her testimony at all. (See, e.g., Tr. at 73 ("I can't exactly recall whether I stepped in them [(the bins)] or slid on them or what. All I know is that it felt like I stepped in one and fell to the floor."); id. at 30 (Plaintiff stating that she could not remember how many bins toppled down in front of her); id. at 28 (affirming to the Court that she could not recall "anything about the stack of bins").) On

---

[6] Indeed, Defendants introduced "demonstrative evidence" at trial in an effort to establish that Plaintiff's description of events is, in fact, impossible. While it is true that during Defendant's demonstration no individual bins separated when a stack of bins was pushed over, the Court does not hazard to guess whether this remains a truism under all conditions, let alone under the precise conditions existing at the time of the Incident. (See Def. Trial Ex. 110 (Demonstrative Exhibit Gray TSA Bins); Tr. at 59-60.) For what it is worth, Viruet and Mazhari also both testified that in their experiences working for TSA, they had never seen bins, or a stack of bins, fall as described by Plaintiff. (See Tr. at 166-67, 212.)

direct examination, Plaintiff initially provided no explanation at all of what caused her to trip. (See Tr. at 29-30.). The Court pressed her for more details, and even then Plaintiff could not explain how falling bins caused her to fall. (See, e.g. Tr. at 30 (informing the Court that she "believe[d]" she tripped over bins and did not just fall, but that she could not remember "one way or the other"); id. (responding "I can't honestly remember if I did," when the Court asked her "Did you step in one of the bins?") Plaintiff's remaining testimony was inconsistent about a number of pertinent details, including whether she was standing still and waiting for other passengers at the time the stack of bins allegedly fell or whether she was in motion and could not stop herself.[7]

Plaintiff's record evidence likewise does not present the Court with a clear picture of what happened. The first time Plaintiff made an official allegation that falling bins from a stack caused her to slip and fall was in her administrative FTCA claim dated September 4, 2008— more than one year after the Incident. (See Def. Trial Ex. 101.) Prior to, and aside from, this administrative form, however, there is little if anything in the record to support Plaintiff's speculation that bins suddenly fell in front of her and caused her to slip and fall.[8]

Even if the Court were to accept Plaintiff's version of events, however, Plaintiff fails to establish by a preponderance of the evidence the next key piece of her prima facie case—*i.e.*, she presents little evidence to establish that this occurrence was caused in any way by Defendants'

---

[7] Compare Tr. at 28 ("I was standing in line waiting to get to the bins, and they just fell over, they toppled in front of me, not all of them, but some of them toppled in front of me."); and id. at 73 (Plaintiff testimony that she was "waiting" for the other passengers "to get out of the way so I could get a bin and go through security"); with id. at 73 (Plaintiff testimony that she was in forward progress and unable to stop herself when the bins fell).

[8] Plaintiff's medical records, for example, present a decidedly muddied account of how Plaintiff's accident transpired. (See, e.g., Pl.'s Trial Ex. 2 at 00017 (Virginia Hospital Center, Emergency Department Nursing Record) ("Slipped on ice injuring [right] ankle"); id. at 00018 (Virginia Hospital Center Emergency Department Patient Care Record) ("trip/fall on some boxes in security line"); id. at 36 (Pen-Bay patient record) ("when going through the security department a couple of trays that normally hold items going through security fell to the floor, she stepped on one and fell"); id. at 174 (MRA letter from Susan M. Hage, D.O. to Dr. Ashmore) ("The security buckets fell in front of her, and she accidentally tripped over them")).

breach of its duty of care. Indeed, Plaintiff provides no clear explanation at all to explain how the stack of bins fell, except to suggest vaguely in her briefing that the stack was too high and to "guess" in her testimony that the stack might have been "wobbly." (See Pl.'s Proposed Findings & Conclusions at 15; Tr. at 72 (in colloquy with the Court, testifying that she was "not sure" what caused the bins to fall, and that it was only her "best guess" that "[t]hey were wobbly".)) Plaintiff essentially seems to speculate that the bins clearly would not have fallen had Defendant used reasonable care. In other words, Plaintiff apparently is relying on the doctrine of *res ipsa loquitor*.

However, "[i]n Virginia, application of the doctrine of *res ipsa loquitur* is limited." Wiggins v. Battlefield Equestrian Center Corp., No. 166789, 1998 WL 961175, at * (Va. Cir. Ct. Dec. 9, 1998) (citing Richmond v. Hood Rubber Prods. Co., 190 S.E. 95, 98 (Va. 1937) (stating that "the doctrine, if not entirely abolished" was limited in its use)). "[T]he mere fact that an accident occurred does not warrant application of the doctrine." Lewis v. Carpenter Co., 477 S.E.2d 492, 494 (Va. 1996) (finding that plaintiff proved only that an accident happened causing her injury, which is insufficient to warrant application of the doctrine of *res ipsa loquitor*). More specifically, before the Court can apply the doctrine, three conditions must be established by the evidence: (1) the instrumentality causing the damage must have been in the exclusive possession or under the exclusive management of the defendant; (2) the accident must have been of such nature and character as would not ordinarily occur if due care had been employed; and (3) evidence as to the cause of the accident would have been accessible to the defendant and inaccessible to the injured part. Id. at 494 (citation omitted). None of these conditions are present here. In particular, and by Plaintiff's own admission, a constant stream of passengers, many of whom were in a rush, were engaging with the stack of bins throughout the morning of

the Incident up to the moment where she fell—the stack of bins was in no way under the exclusive control of Defendant. "Moreoever, the doctrine [of *res ipsa*] never applies in the case of an unexplained accident that may have been attributable to one of two causes, for one of which the defendant is not responsible." Id. (citations omitted). That is precisely the case here.

By contrast, defense witness Viruet provided credible testimony describing the routine procedures he and other TSA employees followed on the morning of the Incident to ensure the smooth and safe passage of individuals through the Checkpoint. For example, Viruet testified that when he viewed passengers crossing over security lanes because there were insufficient bins he responded immediately by instructing another employee to bring out more.[9] While Viruet admitted that he clearly saw a lone bin partially jutting into the passageway, he specifically stated that he did not perceive it to be a hazard. (See Tr. at 158.)

As such, the Court concludes that the plaintiff failed to establish by a preponderance of the evidence that Defendant breached its duty of care. Accordingly, the Court concludes that Defendant was not negligent under the law.

**D. Contributory Negligence**

Even if the Court were to have found that Defendant was negligent, Plaintiff's own contributory negligence would be a complete bar to recovery. The evidence presented at trial establishes by the greater weight of the evidence that Plaintiff fell over, or perhaps stepped in, a

---

[9] Under Virginia law, when a plaintiff's negligence claim involves passive rather than active conduct (i.e., a failure to do more to ensure the safety of an invitee), the plaintiff may prevail only by showing that the defendant had actual or constructive notice of the dangerous condition and failed to remove it or warn about it within a reasonable time. Turley v. Costco Wholesale Corp., 220 F. App'x 179, 181-82 (4th Cir. 2007). Here, the Incident occurred in the very short period of time after Viruet's perception of a potential hazard but before his supervisee could respond by bringing out more bins. (See Tr. at 168 (less than five minutes transpired).) See also, e.g., Safeway Stores, Inc. v. Tolson, 121 S.E.2d 751, 753 (Va. 1961) (reversing verdict for plaintiff and entering judgment for defendant where plaintiff presented no evidence that sawdust, sand or grit on grocery store floor was present long enough to charge store owner with constructive notice).

bin that was clearly visible to an attentive passenger and that Plaintiff failed to adequately examine the floor area where the bin was located prior to her accident.

It is of course true, in Virginia as elsewhere, that "[w]ithout knowledge or warning of danger, an invitee may assume that the premises are reasonably safe for [her] visit." Gottlieb v. Andrus, 104 S.E.2d 743, 746 (Va. 1958). It is equally true, however that "notice is not required where the dangerous condition is open and obvious to a person who is exercising reasonable care for [her] own safety." Id. (citations omitted). Defendant presented evidence establishing that the Checkpoint was adequately lighted and that the light grey color of the bins contrasted with the dark color of the Checkpoint floor. (See, e.g., Tr. at 154, 168.) Viruet testified that, even from his vantage point on the sterile side of the Checkpoint, he could see the bin partially jutting into the passageway. (See Tr. at 156-58.) By contrast, Plaintiff testified that she was looking ahead and anticipating what she had to do to make her way through the Checkpoint, and was not focused on the floor in front of her or the stack of bins beside her. (See, e.g., Tr. at 22, 29, 57-58.).[10]

The Court therefore finds "that, as a matter of law, the alleged hazard was open and obvious to a person exercising ordinary caution for her safety." Kitts, 2010 WL 2218053 at *3. "Plaintiff was not paying attention, and she did not exercise proper care to look where she was stepping." Id. Virginia law has long made clear that a plaintiff cannot recover when "plaintiff would have seen the hazard had she been looking." Id. at *2. For example, in a 1958 case involving a customer who slipped on boxes and fell in a grocery store while retrieving an item from a shelf, the Supreme Court of Virginia overturned a jury award upon concluding that the

---

[10] There was also circumstantial evidence presented that Plaintiff started her day extremely early for a long day of travel, had not consumed any caffeine even though she was a regular coffee drinker and had not eaten breakfast. (See, e.g., Tr. at 54-55, 62; Pl. Trial Ex. 2 at 125, 138.)

customer's own negligence contributed to her injury and barred her recovery. Gottlieb, 104 S.E.2d at 747. The Gottlieb Court explained:

> [Plaintiff] consistently stated that she did not see [the fallen boxes in the grocery store aisle] before she fell, giving as her reason that she was not looking at the floor. It is not questioned that the aisle which the plaintiff entered and along which she walked was adequately lighted. … She could not, in the exercise of ordinary care, close her eyes, which was the equivalent of what she said she did, and walk down this aisle without regard to open and obvious articles in it which would have been apparent to her had she looked even casually on entering the aisle or at any time before she fell.

Id. at 746-47. See also Tazewell Supply Co. v. Turner, 189 S.E.2d 347, 349 (Va. 1972) ("In the instant case [the plaintiff's sister] said she looked casually and saw the box. [The Plaintiff] said she did not look at all and did not see the box. We think it is clear that the plaintiff's own negligence contributed to her injury and bars her recovery."). The Western District of Virginia reached the same result in a very recent case involving a woman who tripped over flat boxes on the floor of K Mart when she was not paying attention:

> Cameron conceded that she failed [to] look far enough down to see the box because she was focusing on items for sale elsewhere in the store. … Virginia law does not recognize distraction by shopping displays as an excuse for failing to exercise proper care in placing one's feet. . . . Cameron was not paying attention and failed to exercise proper care to look where she was stepping. Had she used such care, she certainly would have recognized the potential danger posed by the box.

Cameron v. K Mart Corp., No. 3:09cv00081, 2010 WL 2991014, at *3-*4 (W.D. Va. July 30, 2010).

Based on a careful review of the record before it, the Court finds that the weight of the evidence establishes that the bin was visible to an attentive passenger and that Plaintiff failed to adequately examine the floor area in the Checkpoint passageway prior to stepping into the bin and falling. The Court also has found that the preponderance of the evidence does not establish that any bins fell in front of Plaintiff prior to her falling. In any event, Plaintiff did not present

any evidence that falling bins would have prevented a reasonable person from surveying the floor area and spotting the bin. As such, Plaintiff also has not establishes that her "excuse for inattention was reasonable, *i.e.*, that the distraction was unexpected and substantial." <u>S. Floors & Acoustics, Inc. v. Max-Yeboah</u>, 594 S.E.2d 908, 910 (Va. 2004) (citation omitted).

Although the Court has no clear picture of the events that transpired on March 8, 2007, the Court can only conclude, based on the preponderance of the evidence, that what we had here was a simple and unfortunate accident. In short, because she was not paying full attention, Plaintiff stepped into a lone bin and fell. As the bin was an open and obvious obstacle that a passenger exercising ordinary care would have avoided, the Court concludes that Plaintiff's own negligence was the proximate cause of the Incident.

The Court thus does not reach the award of damages, and accordingly makes no determination as to whether any/all of Plaintiff's injuries were related to the Incident, whether the medical bills submitted and/or the lost wages claim are reasonable, and whether Plaintiff has suffered any diminished quality of life.

## IV. CONCLUSION

In accordance with these findings of fact and conclusions of law, the Court hereby ORDERS Judgment be entered in favor of Defendant United States of America.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 4th day of October, 2010.